J-S52001-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: D.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.M., MOTHER AND | : | |
| A.M., STEP-FATHER | : | No. 1141 EDA 2019 |

Appeal from the Decree April 9, 2019
In the Court of Common Pleas of Delaware County
Orphans' Court at No(s):  113-2014

BEFORE:  OTT, J., KUNSELMAN, J., and McLAUGHLIN, J.

MEMORANDUM BY OTT, J.:                **FILED NOVEMBER 25, 2019**

T.M. ("Mother") and A.M. ("Stepfather") (collectively, "the Petitioners") appeal *pro se* from the Decree entered April 9, 2019, denying their petition for involuntary termination of the parental rights of D.F. ("Father") to D.F. ("Child"), a male born in November 2003, and dismissing all outstanding petitions in the case as moot.  After careful review, we affirm.

The facts and procedural history of this case are not entirely clear from the record.  It appears that Child was born of Mother's brief relationship with Father.  The Petitioners aver on appeal that this relationship lasted less than a year, beginning sometime in 2003 and ending shortly after Child's birth.

The Petitioners' brief at 5. In addition, they aver that Mother met Stepfather in 2007 and married him in 2010. *Id.*[1]

On December 5, 2014, the Petitioners filed their counseled petition to involuntarily terminate Father's parental rights to Child, pursuant to 23 Pa.C.S. § 2511(a)(1), along with a petition for adoption, and a consent to adoption form that Child had signed. The Petitioners averred that Father had no contact with Child since April 2012 and had not contributed to the support of Child since May 2012. They further averred that Father exercised "partial visitation" until Child was three years old, but that, since that time, he had been "in and out of prison, and was recently paroled from SCI Highlands[.]" Petition for Involuntary Termination of Parental Rights, 12/5/14, at ¶ 12. The Petitioners attached to their petition a copy of a temporary custody order, dated March 26, 2013, which awarded sole legal and primary physical custody of Child to Mother, and indicated that Father could file for partial physical custody after his release from incarceration in New Jersey, and/or after July 22, 2013.

Father filed an answer to the termination petition on February 13, 2015. Among other things, Father averred that he was incarcerated from September 2012 until April 2013, and from September 2013 until October 2014. Father

---

[1] Father requests that we strike the portions of the Petitioners' brief for which there is no record support, which includes these averments. Father's brief at 9. It is important to note that we do not rely on the Petitioners' averments as truth, but we include them here only to provide context for the procedural history of this matter.

averred that he filed a petition to modify custody on October 17, 2014, shortly after his release. On February 20, 2015, the orphans' court continued the matter until further order of court, directing that a decision be reached in the custody case before proceeding further in the termination case.

This case remained dormant for nearly four years, until the Petitioners filed a *pro se* petition to relist their prior termination petition on January 10, 2019. The Petitioners averred that, following the proceedings in 2014, the trial court in the custody case entered an order on September 17, 2015, which awarded supervised partial physical custody to Father. The Petitioners further averred that they filed a petition for contempt against Father on December 30, 2015, but that he did not appear at the hearing on June 7, 2016, because of another incarceration.[2]

The orphans' court commenced a hearing on the termination petition on March 4, 2019, at which Father was not present and the Petitioners appeared *pro se*. Father's court-appointed counsel indicated that she had been unable to contact Father at his last-known address, and that she had only recently discovered that he was incarcerated. N.T., 3/4/19, at 3-5. The court then questioned Mother, who acknowledged that she was aware of Father's incarceration because she had been "notified through VINELINK[.]" *Id.* at 6-8. Counsel for Father interjected, explaining that her secretary called Mother

_____

[2] The Petitioners attached a police dispatch report in support of this averment. However, the report describes an incident that took place on June 16, 2016, over a week after the contempt hearing.

- 3 -

and that Mother failed to advise the secretary that "there was an issue with possible incarceration." *Id.* at 7. Following an off-the-record discussion, the court announced that it would continue the hearing so that Father could participate. *Id.* at 8.

At the rescheduled hearing on March 15, 2019, the Petitioners once again appeared *pro se*. Father was still incarcerated but participated in the hearing using video conferencing and his court-appointed attorney was in the courtroom. At the start of the hearing, Mother testified on her own behalf. She testified that Father had not seen Child for "almost two years" at the time she and Stepfather filed their initial petition to terminate Father's parental rights on December 5, 2014. N.T., 3/15/19, at 7. As detailed above, Mother explained that the orphans' court continued the termination matter due to Father's custody petition. *Id.* at 7-8. After the custody proceedings, Father exercised supervised partial physical of Child until he was "once again incarcerated and locked up" in June 2016. *Id.* at 8, 12-13. She continued, "[s]o I would say it's December of 2015 till today there was no contact with [Father] and [Child], no phone calls, no letters, nothing at all." *Id.* at 8. Mother testified that Father's lack of involvement was a theme in Child's life, in that Father would often visit with Child for short periods of time before being incarcerated. *Id.* Father would then "go away for a year or two at a time" before "show[ing] up abruptly, like Christmas Day back in 2010 where he show[ed] up at my doorstep unannounced and just want[ed] to take [Child]." *Id.* Mother added that Father had never called Child on his birthday, sent him

- 4 -

a birthday card, or even acknowledged when it was Child's birthday. *Id.* at 10.

On cross-examination, Father's counsel questioned Mother regarding whether she provided Father with her address or the name of Child's school during the previous two years. *Id.* at 13-14. Mother admitted that she did not provide Father with the name of Child's school or her address, but insisted that her address "is on the docket. It's public record." *Id.* Father's counsel also questioned Mother regarding a video game console that Father purchased for Child. *Id.* at 14. Mother admitted that Stepfather did not allow Child to keep the video game console, although she stressed that she was not present at the time this incident occurred, and that it took place "over three years ago, three-and-a-half years ago." *Id.* at 14-15.

The orphans' court then heard the testimony of Father. Father conceded that he last had contact with Child in either December 2015 or January 2016. *Id.* at 22. Father testified that he has been incarcerated, "[f]or the most part," since that time, and that he did not know where Child was living. *Id.* at 23-24. Father explained that Mother "never really gave me an address or a phone number" and that he had no way of contacting Child over the last two years by sending him a letter or calling him on the phone. *Id.* at 23-25.

Father further testified that he purchased a portable video game device for Child during the time that he was exercising custody. *Id.* at 27. Father recounted that Child used the video game device to stay in contact with him. *Id.* at 28. Father asserted, however, that Stepfather "found out and forbid us

[*sic*] to communicate. . . . But he was sneaking around doing it because he didn't want [Stepfather] to get mad at him." *Id.* at 28. On redirect, Father described a similar incident during which he bought a video game console for Child "for Christmas in 2015 and [Stepfather] refused to let him have it." *Id.* at 42.

On cross-examination, Mother questioned Father regarding whether he sent her certified mail at her home address in connection with the 2014 child custody case. *Id.* at 28-29. When Mother followed up and asked whether he had her address in 2014, Father responded, "I looked it up on BeenVerified[3] because I had to get the mail to you and that was on the advice of the attorney I had. . . . I've had your address[.]" *Id.* at 29.

Mother also questioned Father regarding his failure to place a phone call to Stepfather, whose phone number he had previously possessed. *Id.* at 29-30. Father acknowledged that he was released from incarceration for "[j]ust under 90 days" before being incarcerated again in December 2018. *Id.* at 29. Father explained that he did not attempt to call Stepfather during that time because "I do not have [Stepfather's] phone number. That phone has been gone for the two years. I have no phone number." *Id.* at 29-30. He continued, "I've been incarcerated. That phone that I had is gone. Her

_____

[3] Father indicated elsewhere in his testimony that "BeenVerified" is a website. *See* N.T., 3/15/19, at 23 ("I didn't have the address at the time. How I got her address was off of BeenVerified.com.").

number was in the phone which I no longer have. . . . And [Stepfather's] number was in that phone, which I no longer had." *Id.* at 30.

Finally, the orphans' court heard briefly from Child's guardian *ad litem* ("GAL"). Child's GAL explained that she met with Child once at the courthouse and also spoke to Child once on the phone. *Id.* at 45. The GAL indicated that she had never visited with Father and had no information indicating that Child would be unsafe in Father's care. *Id.* at 45-46. Nonetheless, the GAL noted that, "[a]ccording to [Child], his father did not spend a lot of time with him. He was parented by his stepfather." *Id.* at 46. The GAL presented the court with a report, which the court entered into evidence. In the report, the GAL recommended that the court terminate Father's parental rights, and described Child's preferences as follows: "[Child] explained that all his life he has known [Stepfather] to be his father. His earliest memories include [Stepfather] as his father. The teenager seems to be bonded to his stepfather. [Child] understands what adoption means and expressed his desire to be adopted by his step father, [*sic*] [Stepfather]." The GAL's report at 1-2 (unnumbered pages).

After the hearing, on April 9, 2019, the court entered a decree denying the Petitioners' petition and dismissing all outstanding petitions in the case as moot. The Petitioners timely filed a *pro se* notice of appeal on April 18, 2019, along with a concise statement of errors complained of on appeal.

The Petitioners now raise the following claims for our review:

[1.] Did the [orphans'] court err when it dismissed the Petition for Involuntary Termination of Parental Rights filed by [the Petitioners]?

[2.] Did the [orphans'] court err when it found that [the] Petitioners . . . failed to properly aver the provision of 23 Pa. C.S.[] §[]2511 (a)(2)" …emphasizes [*sic*] the child's present and future need for "essential parental care, control or subsistence necessary for his physical or mental well-being?"

[3.] Did the [orphans'] court err in refusing to allow [the] Petitioners . . . to present evidence and testimony that the best interests of the [c]hild would be served by allowing Step-Father [*sic*] to adopt the child, by not allowing the testimony of Step-Father [*sic*] as it pertains to his relationship with [C]hild or to have said child testify?

[4.] Did the [orphans'] court err when it found that [the] Petitioners . . . engaged in obstructive behavior preventing Father from having a relation[ship] with said [c]hild?

[5.] Did the [orphans'] court abuse its discretion under Section 2313(a.1) of the Adoption Act, 23 Pa.C.S.[] §§ 2101-2938[,] by automatically assigning Father with a [c]ourt[-a]ppointed [a]ttorney?

The Petitioners' brief at 4-5 (suggested answers omitted).

We address these claims mindful of the following standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

- 8 -

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks

omitted).

Section 2511 of the Adoption Act governs involuntary termination of

parental rights. ***See*** 23 Pa.C.S. § 2511. It requires a bifurcated analysis:

> . . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant case, the Petitioners sought to terminate Father's parental

rights pursuant to Sections 2511(a)(1) and (b),[4] which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

_____

[4] In their brief, the Petitioners suggest that the orphans' court erred by failing to terminate Father's parental rights pursuant to Section 2511(a)(2) as well. ***See*** The Petitioners' Brief at 6-7. However, our review of the record confirms that the Petitioners' requested termination of Father's rights in their petition with respect to Section 2511(a)(1) only.

\*\*\*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

\*\*\*

23 Pa.C.S. § 2511(a)(1), (b).

To meet the requirements of Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." ***In re Z.S.W.***, 946 A.2d 726, 730 (Pa. Super. 2008). The orphans' court must then consider the parent's explanation for his or her abandonment of the child, in addition to any post-abandonment contact. ***Id.*** We have emphasized that a parent does not perform parental duties by displaying a merely passive interest in the development of a child. ***In re B.,N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (quoting ***In re C.M.S.***, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 859 A.2d 767 (Pa. 2004)).  Rather,

- 10 -

> [p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Id.* (citations omitted).

Of particular importance to this appeal, incarceration does not relieve a parent of the obligation to perform parental duties. Our case law does not require that an incarcerated parent "perform the impossible." *Id.* at 857. However, that parent must utilize the resources available in prison to preserve a relationship with his or her child. *Id.* at 855; *see also In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012) (discussing *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975)).

On appeal, the Petitioners attempt to present a variety of claims. While the Petitioners divide their claims into five parts in their statement of questions involved, they combine their claims in the argument section of their brief. We observe that the Petitioners have also failed to develop several of the claims listed in their statement of questions involved. To the extent the Petitioners included a claim in their statement of questions involved, but failed to develop that claim in the argument section of their brief, supported with citations to relevant legal authority, it is waived. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim

unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority."). We address only the claims that the Petitioners have preserved for our review.

In essence, the Petitioners contend that the orphans' court should have granted their petition to terminate Father's parental rights because of Father's lack of contact with Child. The Petitioners' Brief at 7-8. They argue that Father had their address and that, while he may have faced obstacles limiting his ability to maintain a relationship with Child, the court erred in concluding that those obstacles were insurmountable or excused his failure to perform parental duties. *Id.* at 8-9. The Petitioners maintain that Father made no effort to overcome the obstacles. *Id.* at 9. They also contend that the court should have found Mother's testimony to be credible. *Id.* at 6-7. They assert that Mother was not attempting to hide the fact that Father was incarcerated during the initial hearing on March 4, 2019, and was agreeable to continuing the matter once she realized Father had not been contacted. *Id.*[5]

_____

[5] The Petitioners attempt to present two additional arguments as well, both of which fail immediately. First, the Petitioners contend that the orphans' court erred by not allowing Child to testify at the hearing. The Petitioners' brief at 9. The record reveals, however, that the Petitioners never requested that the orphans' court permit Child to testify. Additionally, our case law provides that a child's testimony at a termination hearing is not necessary. *See In re B.L.L.*, 787 A.2d 1007, 1014 (Pa. Super. 2001) ("[T]here is no statutory requirement nor is there any Pennsylvania appellate decision which permits or requires the testimony . . . by the child to be placed on the record as an integral part of a termination proceeding.").

The orphans' court explained its denial of the involuntary termination petition as follows, in relevant part:

> The [orphans' c]ourt did not find Mother to be credible. Mother's credibility came into doubt when Mother failed to advise Father's counsel through her staff member of Father's whereabouts or of his possible incarceration, during a phone conversation prior to the March 4, 2019 hearing. Not until after Father's counsel described the extensive efforts she made to try and find Father and the [orphans' c]ourt questioned Mother about Father's whereabouts[,] explaining the importance of Father's rights to due process, [did] Mother admit[] that she believed that Father was incarcerated. Mother explained to the [orphans' c]ourt that VINElink notifies her when Father is incarcerated and through the years, VINElink helped her to find out Father's whereabouts. At the March 15th hearing, Mother testified that Father was currently incarcerated at George W. Hill Prison in Delaware County, Pennsylvania.
>
> There is no dispute that Father has been frequently incarcerated during the [c]hild's life. The [orphans' c]ourt acknowledges that despite being in prison, Father must still make affirmative steps to support the parent-child relationship and that [] Child's life cannot be placed on hold in order for Father to perform his parental responsibilities. However, the Record established that Mother and Stepfather made Father's ability to take such affirmative steps harder by engaging in obstructive behavior.
>
> Mother admitted that she did not provide her address or the name of [] Child's school to Father. Mother further admitted that she refused to allow [] Child to keep a Christmas gift, a P[S]4 Playstation, from Father that [] Child was using to communicate with Father.

Second, the Petitioners argue that the orphans' court displayed bias at the hearing and treated them with "contempt." The Petitioners' brief at 10. Our review of the record belies this contention, and confirms that the court acted with appropriate decorum and treated the Petitioners respectfully during the hearing.

- 13 -

Father testified that Mother never gave him her current home address or phone number and that he does not know where [] Child attends school. Father further testified that upon advice of counsel, he had to look up Mother's address in order to serve the Custody Petition in 2014. Father testified that he and [] Child used the Playstation to communicate with each other, but Stepfather found out about their communications and forbade them from further communication. Father further testified that he has been unable to call [] Child because he does not have Mother, Stepfather or [] Child's phone number.

\*\*\*

At no time did Father tell Mother that he wanted to relinquish his parental rights. In fact, this Petition was originally filed on December 5, 2014, but the [orphans' c]ourt continued the scheduled hearing because Father filed a Petition for Custody on October 17, 2014. The Record established that pursuant to the Custody Orders, Father showed a reasonable willingness and ability to parent [] Child and took advantage of the opportunities that were available to him. In addition, there was nothing in the Record indicating that despite Father having supervised visitation, [] Child was or felt unsafe while in Father's care. The fact that Father had supervised visitation does not require that his parental rights be terminated. Therefore, the [orphans' c]ourt, upon review of the totality of circumstances, properly denied the Petition to involuntary [sic] terminate Father's parental rights.

\*\*\*

Orphans' Court Opinion, 6/18/19, at 12-15 (citations to the record omitted).

After careful review of the record in this matter, we discern no error of law or abuse of discretion by the orphans' court. Instantly, the Petitioners filed their petition to relist the prior petition to terminate Father's parental rights on January 10, 2019. While it is clear that Father failed to perform parental duties for Child during the six months immediately preceding the filing of the petition, the record confirms that the Petitioners erected obstacles

that impaired his ability to do so. Mother conceded that she did not provide Father with her address or with the name of Child's school during the previous two years. N.T., 3/15/19, at 13-14. In addition, Mother acknowledged that Stepfather did not allow Child to keep a video game console from Father. **Id.** at 14-15. Father elaborated on these obstacles during his own testimony, explaining that Stepfather forbade Child from communicating with him using a portable video game device, and that he lost Stepfather's phone number after being incarcerated. **Id.** at 27-30.

In reaching this conclusion, we emphasize that this Court must accept the findings of fact and credibility determinations of the orphans' court if the record supports them. **T.S.M.**, 71 A.3d at 267; **see also In the Interest of D.F.**, 165 A.3d 960, 966 (Pa. Super. 2017), *appeal denied*, 170 A.3d 991 (Pa. 2017) ("The Orphans' Court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence."). Moreover, this Court may not reverse simply because the record could also support the opposite result. **See S.P.**, 47 A.3d at 826-27 ("Therefore, even where the facts could support an opposite result . . . an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment[.]").

In the instant case, Mother's behavior and testimony strongly supports the assessment of her credibility by the orphans' court. As described above, Mother admitted at the hearing on March 4, 2019, that she was aware Father

was incarcerated prior to the filing of the petition to relist the prior petition to terminate his parental rights. N.T., 3/4/19, at 6-8. However, the Petitioners did not indicate in the petition to relist that Father was currently incarcerated. To the contrary, the certificate of service attached to the petition indicates that the Petitioners served Father at his last known address outside of prison. Father's counsel also stated that she was not aware Father was incarcerated and that Mother did not inform counsel's secretary that he was incarcerated during a phone call. *Id.* at 7. When asked whether she provided Father with her address or with the name of Child's school, Mother's response further confirmed the court's assessment that she has been unwilling to support the relationship between Father and Child. The record contains the following exchange between Mother and Father's counsel:

Q. Now, am I correct that in the last two years, you did not provide your home address to [Father]?

A. In the last three years and my address is on the docket. It's public record.

Q. Did you provide your address to [Father]?

A. I had no contact with [Father.]

Q. Is your answer, no?

A. My answer is no.

Q. Did you provide the name of the school that [Child] has been attending for the last three years at any time to [Father]?

A. How I am going to get him that information?

Q. Is your answer, no?

A. My answer is no.

N.T., 3/15/19, at 13-14.

Based on the foregoing, we affirm the April 9, 2019 decree denying the petition to terminate Father's parental rights to Child. It is important to note that Father must make efforts to maintain a relationship with Child going forward. Any ongoing failure to make these efforts may result in Mother filing another petition to terminate his rights. As we stated above, "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." ***B.,N.M.***, 856 A.2d at 855.[6, 7]

Decree affirmed.

---

[6] Because we conclude that the orphans' court did not commit an error of law or abuse of its discretion by denying termination pursuant to Section 2511(a), we need not conduct an analysis of Section 2511(b). Thus, we do not address the GAL's recommendation or her assertion that Child prefers adoption.

[7] We also note that Child may consent to his adoption by Stepfather without involuntary termination of Father's parental rights once he turns eighteen. ***See*** 23 Pa.C.S. § 2713(1) ("The court, in its discretion, may dispense with consents other than that of the adoptee to a petition for adoption when: (1) the adoptee is over 18 years of age[.]").

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/25/19